The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: July 25, 2024

**NO. S-1-SC-39266**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**JULIANNA MONTANO, a/k/a**
**JULIANNA P. MONTANO, a/k/a**
**JULIANNA PAULINE MONTANO,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Daniel J. Gallegos, District Judge**

Hector H. Balderas, Attorney General
Benjamin L. Lammons, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Steven J. Forsberg, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**OPINION**

**VIGIL, Justice.**

{1}     This opinion requires us to consider and apply the judicially created absurdity doctrine which gives courts authority to change the unambiguous, plain meaning of a statute duly enacted by the Legislature. Specifically, we address whether the district court properly reclassified a second-degree felony—homicide by vehicle while under the influence (DWI homicide), NMSA 1978, Section 66-8-101(C) (2016)—from a nonviolent offense to a serious violent offense in the Earned Meritorious Deductions Act (EMDA), NMSA 1978, § 33-2-34 (2015). The district court made the reclassification despite the unambiguous, plain language of the EMDA classifying DWI homicide as a nonviolent offense. We conclude that the classification made by the Legislature in the EMDA is not absurd and that the district court erred. In arriving at this conclusion we defer to the separation of powers doctrine. It is solely within the prerogative of the Legislature to classify DWI homicide as a serious violent offense through the legislative process.

**I.     BACKGROUND**

**A.     The EMDA and Homicides by Vehicle**

{2}     The EMDA is "a 'carefully structured' law" establishing detailed rules for determining eligibility for good time deductions from a prisoner's period of

confinement. *State v. McDonald*, 2004-NMSC-033, ¶ 20, 136 N.M. 417, 99 P.3d 667 (citation omitted); *State v. Rudolfo*, 2008-NMSC-036, ¶ 35, 144 N.M. 305, 187 P.3d 170; *see also State v. Tafoya*, 2010-NMSC-019, ¶ 19, 148 N.M. 391, 237 P.3d 693 (describing the EMDA as a system where inmates can reduce their sentences for exhibiting good behavior or participating in approved programs while incarcerated). The structure is straightforward. First, good time deductions may not be awarded to inmates serving life imprisonment. Section 33-2-34(G). Second, the sentence for "a 'serious violent offense'" limits good time deductions to four days per month of time served. Section 33-2-34(A)(1). A "serious violent offense" falls into one of two categories: per se or discretionary. A per se serious violent offense is any one of fourteen specifically enumerated crimes. Section 33-2-34(L)(4)(a)-(n). A discretionary serious violent offense is one of fifteen specifically enumerated crimes that, in considering "the nature of the offense and the resulting harm," the sentencing court has the discretion to designate as a serious violent offense. Section 33-2-34(L)(4)(o). Third, the EMDA designates any offense other than a serious violent offense as a "'nonviolent offense,'" enabling inmates to earn good time deductions of up to thirty days per month of time served. Section 33-2-34(A)(2), (L)(3). *See Rudolfo*, 2008-NMSC-036, ¶¶ 36-38; *McDonald*, 2004-NMSC-033, ¶ 20.

{3}    We now turn to the offense at issue in this case: DWI homicide. Before 2016, homicide by vehicle was a third-degree felony, whether committed by DWI or reckless driving, NMSA 1978, § 66-8-101(C) (2004), and a convicted defendant was subject to a basic six-year sentence, NMSA 1978, § 31-18-15(A)(7) (2007) (providing a basic six-year sentence for "a third-degree felony resulting in the death of a human being"). But today and since 2006, Section 33-2-34(L)(4)(o)(14) of the EMDA[1] lists "third degree homicide by vehicle" as a discretionary "serious violent offense."). If the sentencing court determined the crime was a serious violent offense, the defendant was limited to earning four days per month of good time deduction. *See McDonald*, 2004-NMSC-033, ¶ 20 (providing that courts consider a discretionary serious violent offense as a "violent" crime if the defendant committed it "in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm" (internal quotation marks and citation omitted)). Without such a determination, the EMDA categorized the conviction as a nonviolent offense, entitling the defendant to earn up to thirty days per month of good time deduction.

---

[1]and historically, NMSA 1978, Section 33-2-34(L)(4)(n)(12) (1999) of the EMDA's *enactment* as well

{4}	In 2016, the Legislature amended Section 66-8-101, elevating the current DWI homicide to a second-degree felony, *compare*, NMSA 1978, § 66-8-101(C) (2004), *with* § 66-8-101(C), and increasing its basic sentence from six years to fifteen years, Section 31-18-15(A)(4), (8) (2016). The amendment did not change reckless driving homicide, for example, which remains a third-degree felony subject to a basic six-year sentence. Section 66-8-101(D). As for the EMDA, the Legislature did not make any corresponding amendments to it. *See* Section 33-2-34(L)(4)(o) (listing "third degree homicide by vehicle or great bodily harm by vehicle, as provided in Section 66-8-101," as one of the fifteen enumerated discretionary serious violent offenses). Thus, second-degree DWI homicide is not identified in the EMDA as either a per se or discretionary serious violent offense, which by statutory definition makes it a nonviolent offense with eligibility to earn up to thirty days of good time deductions per month of time served. *See* § 33-2-34(L)(3) (defining "nonviolent offense" to mean "any offense other than a serious violent offense"); § 33-2-34(A)(2) (allowing good time "up to . . . thirty days per month of time served" for "a prisoner confined for committing a nonviolent offense"). A defendant convicted of third-degree reckless driving homicide, on the other hand, may be limited to earning four days of good time deductions per month of time served because reckless

4

driving homicide remains a discretionary serious violent offense under the EMDA. It is in this statutory context that the issue before us arises.

**B.      Factual and Procedural Background**

{5}      The facts are uncontested. Following a tragic accident, a grand jury indicted Julianna Pauline Montano (Defendant) for DWI homicide, contrary to Section 66-8-101; reckless child abuse (no death or great bodily harm), contrary to NMSA 1978, Section 30-6-1(D) (2009); aggravated DWI, contrary to NMSA 1978, Section 66-8-102(D)(1) (2016); leaving the scene of an accident (death), contrary to NMSA 1978, Section 66-7-201(A) & (B) (1989); and reckless driving, contrary to NMSA 1978, Section 66-8-113 (1987). Pursuant to a plea and disposition agreement approved by the district court, Defendant pleaded guilty to DWI homicide, and the remaining charges were dismissed. Defendant filed a motion to be sentenced for a nonviolent offense under the EMDA, and following a hearing the district court entered its order denying Defendant's motion. The district court's subsequent judgment and sentence identified Defendant's conviction of DWI homicide as a "Special Penalty 2nd Degree Felony" and a "Serious Violent Offense," incurring a sentence of fifteen years.

{6}      The district court agreed that under the "plain wording" or "plain meaning" of the EMDA, DWI homicide is a nonviolent offense. However, the district court

concluded that the omission of DWI homicide as a discretionary serious violent offense in the EMDA must have been a legislative oversight, which resulted in an absurdity. The district court based its conclusion on the fact that each of the offenses enumerated under Section 66-8-101 is included in the EMDA's list of discretionary serious violent offenses—including reckless driving homicide, causing great bodily injury by DWI, and causing great bodily injury by reckless driving—except for DWI homicide. Further, the district court concluded that it would depart from the plain wording of the EMDA to "correct an absurdity, and likely a mistake" and treat DWI homicide as a discretionary serious violent offense under the EMDA. The district court then considered "the nature of the offense and the resulting harm," to determine that Defendant committed a serious violent offense and was only entitled to earn a maximum of four days credit per month under the EMDA.

{7} Defendant appealed the district court's determination that DWI homicide is a discretionary serious violent offense under the EMDA. *State v. Montano*, 2022-NMCA-049, ¶ 1, 517 P.3d 267. The Court of Appeals agreed with Defendant and reversed. *Id*. For the following reasons, we agree and affirm the result reached by the Court of Appeals.

6

## II.  DISCUSSION

{8}    Our review of the district court's authority to classify the defendant as a serious violent offender under the EMDA is de novo. *See State v. Bennett*, 2003-NMCA-147, ¶ 4, 134 N.M. 705, 82 P.3d 72.

{9}    In interpreting the EMDA, "our primary goal is to give effect to the Legislature's intent." *State v. Wilso*n, 2006-NMSC-037, ¶ 6, 140 N.M. 218, 141 P.3d 1272; *see State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022. To best comprehend the Legislature's intent, we "first look to the plain language of the statute." *State v. Padilla*, 2008-NMSC-006, ¶ 7, 143 N.M. 310, 176 P.3d 299. Aiding this determination, we assume that the Legislature was well informed of existing statutory and common law when the EMDA was enacted and subsequently amended. *State v. Maestas*, 2007-NMSC-001, ¶ 21, 140 N.M. 836, 149 P.3d 933; *see Citation Bingo, Ltd. v. Otten*, 1996-NMSC-003, ¶ 21, 121 N.M. 205, 910 P.2d 281 ("[W]e presume that the legislature . . . did not intend to enact a law inconsistent with existing law."). "Statutes are[, therefore,] given effect as written and, where they are free from ambiguity, there is no room for construction." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 2, 117 N.M. 346, 871 P.2d 1352 (internal quotation marks and citation omitted).

{10}    As the Court of Appeals correctly noted, the EMDA's "clear and unambiguous language" does not list DWI homicide "as either a per se or discretionary serious violent offense." *Montano*, 2022-NMCA-049, ¶ 10. As such, "the plain meaning of the EMDA designates second degree homicide by vehicle as a nonviolent offense." *Id*. Therefore, we consider whether the literal application of the EMDA's plain language is absurd.

**A.    The Absurdity Doctrine**

{11}    The Supreme Court of the United States (U.S. Supreme Court) first recognized the absurdity doctrine in 1819. Chief Justice John Marshall declared that a court's obligation to give effect to the literal language of a statute ends when "the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." *Sturges v. Crownshield*, 17 U.S. 122, 202-03 (1819), *superseded by statute on other grounds*, *as recognized in Bank of U.S. v. Frederickson*, 2 F. Cas. 744 (D. Pa. 1821).

{12}    The U.S. Supreme Court first applied the absurdity doctrine in *United States v. Kirby*, 74 U.S. (7 Wall.) 482 (1868). The defendant was a sheriff who arrested a mail carrier pursuant to an arrest warrant for murder. *Id*. at 483-84. However, a federal statute made it a crime to "'knowing and willfully' obstruct or retard the passage of the mail, or of its carrier." *Id*. at 485 (citation omitted). While the

8

arresting-officer/defendant was, therefore, found guilty of violating the unambiguous, literal language of the statute, the U.S. Supreme Court declined to apply the plain language of the statute, holding that "common sense" dictates that the statute "does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder" because a statute should be limited in its application to avoid an "absurd consequence." *Id*. at 486-87. In support, the U.S. Supreme Court referred to two earlier European cases in which "common sense" dictated that the clear, unambiguous language of the law did not apply. In the first case, the court ruled that a surgeon who opened the vein of a person who fell on the street in a fit was not subject to punishment under a law stating that "whoever drew blood in the streets should be punished with the utmost severity." *Id*. at 487 (internal quotation marks and citation omitted). In the second case, a law "that a prisoner who breaks [out of] prison shall be guilty of [a] felony, does not extend to a prisoner who breaks out when the prison is on fire—for he is not to be hanged because he would not stay to be burnt." *Id*. (internal quotation marks and citation omitted). In *Kirby* and the two cited European cases, the courts applied the absurdity doctrine to statutes that were reasonable on their face, but when applied to the specific facts of those cases, an absurdity resulted.

{13}     Subsequently, the U.S. Supreme Court expanded the absurdity doctrine by concluding that a statute was absurd as applied generally to a group of individuals. In *Holy Trinity Church v. United States*, 143 U.S. 457 (1892), the Holy Trinity Church as a corporation contracted with an individual in England to move to the United States to serve as a pastor in its church. *Id*. at 458. The federal government sued the corporation under a statute prohibiting businesses from bringing anyone into the United States "to perform labor or service of any kind." *Id*. (internal quotation marks and citation omitted). The U.S. Supreme Court determined that, notwithstanding the statute's broad language, including pastoral services in its prohibition was absurd. *Id*. at 458-59. The U.S. Supreme Court referenced the "familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not . . . within the intention of its makers." *Id*. at 459. The U.S. Supreme Court looked to the statute's legislative history, which, it said, demonstrated that the Legislature intended the word "labor" in the statute to mean "cheap, unskilled labor" but not "brain toilers" ("any . . . whose toil is that of the brain"), which excluded pastoral services. *Id*. at 458-59, 462-65. Therefore, *Holy Trinity Church* "made clear the rationale" for the absurdity doctrine: "to avoid a result that [is] contrary to legislative intent." Linda D. Jellum, *But That Is Absurd!: Why Specific Absurdity Undermines Textualism*, 76 Brook. L. Rev. 917, 925 (2011).

Additionally, unlike *Kirby*, which applied the absurdity doctrine to a particular case, *Holy Trinity Church* extended its application to prohibit the general application of the statute to a group of individuals—all "brain toilers." *See* 143 U.S. at 464.

{14}     Scholars point out that federal courts and the highest courts of almost all fifty states and the District of Columbia (D.C.) endorse the absurdity doctrine. Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 Am. U. L. Rev. 127, 129 (1994). Courts recognize two types of absurdity: specific absurdity and general absurdity. Jellum, *supra*, at 918. Specific absurdity refers to "those statutes that are absurd as applied to the facts of a particular case, but not absurd as applied generally." *Id.* That is to say, the statute is absurd only in a specific situation, *id.*, as discussed in *Kirby*, 74 U.S. at 487, which serves as a classic example of specific absurdity. In contrast, general absurdity refers to "those statutes that are patently absurd as written and, thus, as applied generally, to a group of individuals." Jellum, *supra*, at 918. "General absurdity refers to a statute that is absurd regardless of the particular situation." *Id.* at 928. *Holy Trinity Church*, 143 U.S. 457, is the original example of general absurdity.

{15}     Importantly, the absurdity doctrine is not a tool that is used to interpret an ambiguous statute; it only applies to statutes that are clear and unambiguous. *See*

11

*Maestas*, 2007-NMSC-001, ¶ 9 ("[W]e look to the plain language of the statute to determine if it is ambiguous, and if not ambiguous, whether following the language would lead to an absurd result."); *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 534 (Iowa 2017) (stating that under the absurdity doctrine, courts decline to follow the literal terms of a statute to avoid absurdity). When properly invoked, the doctrine gives a judge the authority and power to avoid an absurd result which the plain words of the statute would otherwise require. "This is a radical thing; judges are not supposed to rewrite laws. Ordinarily, such actions would be condemned as a usurpation of the legislative role, an unconstitutional violation of the separation of powers." Dougherty, *supra*, at 128. Nevertheless, judges in almost all fifty states and in federal courts and D.C. have exactly that power and authority under the absurdity doctrine. *Id*. at 129.

{16}   However, precedent does not consistently define absurdity. *Id.* at 128-29; Jellum, *supra*, at 921 n.25. At one extreme, jurists define it as "contrary to congressional intent" and at the other as "'leading to results so gross as to shock the general moral or common sense.'" Jellum, *supra*, at 921 n.25 (comparing the majority opinion and dissent in *Robbins v. Chronister*, 402 F.3d 1047, 1050 (10th Cir. 2005) and stating that the majority's definition subjects almost any statute to consideration of extratextual evidence while the dissent's definition will rarely, if

ever, be satisfied) Nor can the cases applying the absurdity doctrine be uniformly categorized or analogized to one another to uncover a consistent definition of absurdity. *See* Dougherty, *supra*, at 139. "Rather, judges often attempt to define absurdity by simply identifying, without explaining, other cases in which absurdity has been found." Jellum, *supra*, at 921 n.25.

{17} This raises the question of how to define absurdity within the framework of the absurdity doctrine. An appropriate beginning for resolving the dilemma of giving a principled meaning to absurdity under the doctrine is the dictionary. Dougherty, *supra*, at 140. Dictionary definitions of absurd include (1) "'clearly untrue or unreasonable; ridiculously inconsistent with reason, or the plain dictates of common sense; logically contradictory,'" *id.* (quoting *Webster's New Universal Unabridged Dictionary* 8 (2d ed. 1983)); (2) "'not in accordance with common sense, very unsuitable,'" *id.* (quoting *Oxford American Dictionary* 5 (1st ed. 1980)); and (3) "'ridiculous, foolish,'" *id.* (quoting *Black's Law Dictionary* 10 (5th ed. 1979)). "These definitions suggest the kinds of things that the absurd result principle guards within the legal system," Dougherty, *supra*, at 140, which are the values related to "rationality, reasonableness, and common sense," *id*. at 150-53, 164. The historical underpinnings and universal acceptance of the absurdity doctrine demonstrate that these values are rooted in "the rule of law," which espouses "predictability of the

13

law" and "the coherence of the legal system as a whole." *Id*. at 133. Understood in this sense, the literal application of a statute is absurd when it contradicts the values of rationality, reasonableness, and common sense. Thus, "[t]he absurd result principle is both a surrogate for, and a representative of, rule of law values." *Id*.

**B.      The Absurdity Doctrine in New Mexico**

{18}      Like most other states, federal courts, and D.C., we recognize and apply the absurdity doctrine. This Court has only applied the absurdity doctrine in assessing whether a statute is inherently absurd as written (general absurdity) because no case has presented a statute, reasonable on its face but absurd as applied to the facts of the particular case (specific absurdity). *See Tafoya*, 2010-NMSC-019, ¶¶ 14-17 (holding that classifying first-degree murder as a nonviolent offense when committed by a serious youthful offender under the EMDA is absurd); *Compton v. Lytle*, 2003-NMSC-031, ¶¶ 19-20, 134 N.M. 586, 81 P.3d 39 (concluding that a statute providing that "any" inmate is eligible for good-time credits is absurd as applied to inmates on death row) (*superseded by statute as stated in Tafoya*, 2010-NMSC-019, ¶ 16); *cf. Maestas*, 2007-NMSC-001, ¶¶ 11-13, 16, 24-25 (holding as *not absurd* a criminal statute that defines "public employee" to exclude judges).

{19}      However, none of our precedential opinions define absurdity, nor have we described how analytically to define it; we have only stated whether the result was

14

or was not absurd. *Maestas*, 2007-NMSC-001, ¶ 24; *Compton*, 2003-NMSC-031, ¶ 20; *Tafoya*, 2010-NMSC-019, ¶ 17. We take this opportunity to adopt the approach suggested by Jellum, which we have just discussed: we will reject the literal application of a statute as absurd when the result is an outcome that contradicts the values of rationality, reasonableness, and common sense. In this regard, we emphasize that because the separation of powers doctrine otherwise counsels against ignoring terms in a statute duly adopted by the Legislature, courts must only invoke the absurdity doctrine in extreme cases and even then, most sparingly. *See Switzer v. Wood*, 35 Cal. App. 5th 116, 129 (2019).

{20}    The following is the process we use to analyze a statute for specific and general absurdity. If the Legislature does not otherwise define words in the statute, courts should find their meaning in common dictionary definitions. *See State v. Vest*, 2021-NMSC-020, ¶ 14, 488 P.3d 626. The absurdity doctrine applies if the statute's plain language results in an absurdity as we have described it. *See Compton*, 2003-NMSC-031, ¶¶ 5, 20 (concluding that the historic reference to good time deductions for "'[a]ny inmate'" in Section 33-2-34(A) (1988, repealed and reenacted 1999, as amended through 2015) results in an absurdity as related to inmates on death row). In this limited and narrow circumstance, our courts may "substitute, disregard, eliminate, insert, or add words" to the statute to eliminate the absurdity. *Maestas*,

15

2007-NMSC-001, ¶ 15. In addition, the absurdity doctrine applies when the literal application of a statute results in an absurdity that the Legislature "could not have intended." *Bennett*, 2003-NMCA-147, ¶ 10 (internal quotation marks and citation omitted); *see also Switzer*, 35 Cal. App. 5th 116, 129 (same); *State v. Matthews*, 933 N.W.2d 152, 157 (Wisc. App. 2019) (same); *Heist v. Nebraska Dep't of Corr. Servs.*, 979 N.W.2d 772, 786 (Neb. 2022) (same).

{21} Concluding that the result is something the Legislature "could not possibly have intended" is a high bar. *Heist*, 979 N.W.2d at 786. Our courts must remain mindful that it is not their role "to question the wisdom, policy or justness of legislation enacted by our legislature." *Maestas*, 2007-NMSC-001, ¶ 25. If legislative oversight was the cause of an error or omission in a statute, then it is left for the Legislature, not the courts, to correct the mistake. *Id.*; *see Heist*, 979 N.W.2d at 786 (stating that the absurdity doctrine "does not justify judicial revision of a statute simply to make the statute more reasonable in the judges' view"); *Switzer*, 35 Cal. App. 5th at 129; *Matthews*, 933 N.W.2d at 157 (stating that it is not enough for a court to find a given outcome foolish under the plain meaning of a statute; instead, the court "must be convinced that the result is so absurd that the legislature, not the court, could not have intended such a result." (brackets, internal quotation marks, and citation omitted)).

16

## C.     Absurdity in the EMDA

{22}     We now turn to whether there is an absurdity in the EMDA. As discussed in detail herein, the issue arises because the district court ruled that the omission of DWI homicide from the EMDA's list of discretionary serious violent offenses created an absurd result.

{23}     Before 2016, homicide by vehicle was a third-degree felony, whether committed by DWI or reckless driving, and the Legislature enumerated it as a discretionary serious violent offense in the EMDA. In 2016, the Legislature made DWI homicide and reckless driving homicide separate crimes. The Legislature also raised DWI homicide to a second-degree felony and left reckless driving homicide as a third-degree felony.

{24}     However, the Legislature made no changes to the EMDA. The result is that under the unambiguous plain language of the EMDA, the sentencing court may treat reckless driving homicide as a serious violent offense, meaning that the defendant can earn a maximum of four days per month of good time deduction. On the other hand, by its plain language, the EMDA classifies DWI homicide as a nonviolent offense, meaning that a defendant can earn a maximum of thirty days per month of good time deductions. The district court in this case ruled this result was "likely a mistake" and absurd because DWI homicide is a more serious offense than reckless

17

driving homicide. Respectfully, we disagree.

{25} The EMDA has no effect on the sentence a defendant receives. Rather, it is a carefully crafted statute enacted by the Legislature to encourage prisoners to participate in authorized prison programs for their rehabilitation, thereby earning meritorious deductions and reducing the time that an inmate must serve before becoming eligible for parole or release. *Tafoya*, 2010-NMSC-019, ¶ 11; *State v. Bryant*, 2023-NMCA-016, ¶ 13, 525 P.3d 367; *State v. Andazola*, 2003-NMCA-146, ¶ 21, 134 N.M. 710, 82 P.3d 77; *see also Coutts v. Cox*, 1966-NMSC-027, ¶ 8, 75 N.M. 761, 411 P.2d 347 (per curiam) ("This legislation was passed to encourage cooperation by inmates with the penal institution and sets out an earlier release as an incentive for such good behavior.").

{26} In 2016, when the Legislature changed DWI homicide without making corresponding changes to the EMDA, it enacted a reasonable policy preference. It raised the basic sentence for DWI homicide from six years to fifteen years and, at the same time, provided a substantial incentive for a prisoner to participate in available rehabilitation programs. If convicted inmates refuse to participate in rehabilitation programs, they will serve an entire fifteen-year sentence. On the other hand, if an inmate qualifies and participates in approved rehabilitative programs, the inmate's prison term may be reduced from fifteen to seven and one-half years.

18

Choosing whether to participate in available rehabilitative programs in the prison is up to the inmate. However, even if an inmate convicted of DWI homicide earns the maximum amount of good time deductions, that inmate will serve more time (seven and one-half years) than an inmate convicted of reckless driving homicide, whether a court's discretion finds it to be a serious violent offense (5.2 years if the six-year sentence is reduced by four days per month of time served) or a nonviolent offense (three years if the six-year sentence is reduced by thirty days per month of time served). This is consistent with the 2016 amendment to the statute that made DWI homicide a more serious offense (a second-degree felony) than reckless driving homicide (a third-degree felony).

{27} This result does not violate the values of rationality, reasonableness, and common sense. Nor is the result one that the Legislature could not have intended. Our courts have repeatedly given effect to the EMDA as written and have rejected arguments to include certain crimes as serious violent offenses when they are not categorized as serious violent offenses under the EMDA's plain, literal language. *Rudolfo*, 2008-NMSC-036, ¶ 38 (holding that attempted first-degree murder and tampering with evidence "can[not] be considered 'serious violent offenses'" because the EMDA does not list them as such); *McDonald*, 2004-NMSC-033, ¶¶ 21-23 (concluding that conspiracy is not a mandatory or discretionary serious violent

19

offense because the EMDA does not list it as such); *State v. Loretto*, 2006-NMCA-142, ¶ 9, 140 N.M. 705, 147 P.3d 1138 (holding that because the EMDA did not set forth attempted first-degree criminal sexual penetration as a serious violent offense, courts could not consider it as such); *Bennett*, 2003-NMCA-147, ¶¶ 8-13 (concluding that aggravated battery against a household member may not be regarded as a serious violent offense because the EMDA does not include it as a serious violent offense).

{28} "'[I]t is the particular domain of the legislature, as the voice of the people, to make public policy.'" *McDonald*, 2004-NMSC-033, ¶ 22 (alteration in original) (quoting *Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609, 894 P.2d 386). As such, the Legislature must determine whether it wants to designate a crime as a serious violent offense in the EMDA. *McDonald*, 2004-NMSC-033, ¶ 22. The absurdity doctrine does not give a court license to rewrite a statute based on its conclusion that the result is one it would not have to come to. Nor does the absurdity doctrine allow a court to substitute its judgment for the Legislature's to make a statute, in the mind of the court, more just, reasonable, or wise. If the Legislature overlooked amending the EMDA, "then it is the legislature, not this Court, that should correct this mistake." *Maestas*, 2007-NMSC-001, ¶ 25. The constitutional separation of powers doctrine demands no less. *See* N.M. Const. art. III, § 1.

20

## III. CONCLUSION

{29} The district court erred in its ruling that the EMDA is absurd for excluding DWI homicide as a discretionary violent offense. We, therefore, affirm the result reached by the Court of Appeals, reverse the district court's order, and remand this case to the district court to amend its judgment and sentence in accordance with this opinion.

{30} **IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**C. SHANNON BACON, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**