This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-41518**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**JASON NOWELL a/k/a
JASON LEE NOWELL,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY
Angie K. Schneider, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Michael J. Thomas, Assistant Solicitor General
Albuquerque, NM

for Appellee

Aarons Law PC
Stephen D. Aarons
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**DUFFY, Judge.**

**{1}** Defendant Jason Nowell was convicted of aggravated stalking, contrary to NMSA 1978, Section 30-3A-3.1 (1997), false imprisonment, contrary to NMSA 1978, Section 30-4-3 (1963), deprivation of the property of a household member, contrary to NMSA 1978, Section 30-3-18(C), (D) (2009), and interference with communications, contrary to NMSA 1978, Section 30-12-1 (1979). Defendant raises four issues on

appeal: (1) the district court erred in omitting two essential elements from the aggravated stalking jury instruction; (2) the errors in the aggravated stalking instruction infected the jury's deliberations on the false imprisonment conviction; (3) Defendant's convictions for deprivation of the property of a household member and interference with communications violate his right to be free from double jeopardy; and (4) the district court erred in designating Defendant's false imprisonment and aggravated stalking convictions as serious violent offenses under the Earned Meritorious Deductions Act (EMDA), NMSA 1978, § 33-2-34 (2015). We affirm in part and reverse in part.

## BACKGROUND

**{2}** Defendant's convictions arise from two interactions he had with his ex-wife (Victim) on May 2, 2022. At that time, Defendant was subject to an order of protection that had been in place for nearly two years and prohibited Defendant from contacting Victim or "committing further acts of abuse or threats of abuse."

**{3}** According to testimony offered at trial, on the morning of May 2, 2022, Defendant went, uninvited and unannounced, to Victim's home and threatened her with a knife. Victim called 911 but did not speak to the dispatcher. Officers were dispatched to Victim's home in response to the abandoned call. Upon arriving at Victim's home, an officer saw Defendant, who fled out of the back door of the house. Officers searched the neighborhood for Defendant but were unable to locate him and left Victim's property after approximately half an hour. The officers had Defendant's truck towed from Victim's property.

**{4}** That afternoon Defendant returned and again entered Victim's house. Defendant was angry and expressed his desire to retrieve his truck. Defendant took Victim's car keys and phone, got into Victim's car with Victim in the passenger seat, and drove to pick up their youngest child from school. After picking up the child, Defendant stopped at a gas station and then proceeded to his father's place of business. Once they arrived at the business, Defendant and the child got out of the car. Victim, using a spare key to her car, drove directly to the police station to report what had happened.

**{5}** Defendant was subsequently indicted on nine counts: two counts of aggravated burglary, two counts of aggravated battery against a household member, aggravated assault against a household member, aggravated stalking, false imprisonment, deprivation of the property of a household member, and interference with communications. Following trial, the jury acquitted Defendant of the aggravated burglary, aggravated battery, and aggravated assault charges. The jury found Defendant guilty of aggravated stalking, false imprisonment, deprivation of the property of a household member, and interference with communications. Defendant was sentenced to nine and one half years, minus two days, in the custody of the New Mexico Department of Corrections. The court found the aggravated stalking and false imprisonment convictions to be serious violent offenses for purposes of the EMDA. Defendant appeals.

## DISCUSSION

### I. Aggravated Stalking

**{6}** Defendant raises two claims of error regarding the jury instruction given for the aggravated stalking count. Both of Defendant's claims relate to the second element, which instructed the jury on alternative theories as to how Defendant committed the crime. The relevant portion of the instruction provided:

> 2. At the time of the offense, [Defendant] knowingly violated a permanent or temporary order of protection issued by a court;
>
> [o]r
>
> [Defendant] was in possession of a knife.

With respect to the first alternative, Defendant argues that the district court erred in refusing his request to include "mutual violation" language that would have required the jury to find that Victim did not also violate the order of protection. *See* UJI 14-333(2) NMRA. With respect to the second alternative, Defendant argues the instruction omitted language requiring the jury to determine whether the knife was a deadly weapon. *See id.* We address each argument in turn.

### A. Mutual Violation

**{7}** Defendant requested an aggravated stalking instruction that would have required the jury to find that "[a]t the time of the offense: [Defendant] knowingly violated a permanent or temporary order of protection issued by a court *and the* [*V*]*ictim did not also violate the court order*." The district court refused Defendant's requested instruction in favor of the State's proposed instruction, which did not include the italicized clause. Because Defendant preserved this claim of error, we review the district court's ruling under a reversible error standard. *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

**{8}** The uniform jury instruction for aggravated stalking sets out the essential element for this theory as follows: "At the time of the offense: (the defendant) knowingly violated a permanent or temporary order of protection issued by a court (and the victim did not also violate the court order)." UJI 14-333(2). The language in the second parenthetical—what Defendant refers to as "mutual violation" language—is subject to a use note that states, "Use only applicable alternative." *Id.* use note 3. The district court found that this case did not present a "mutual violation" situation and declined to include the parenthetical language on that basis.

**{9}** Defendant argues that the "mutual violation" language should have been included based on interactions he had with Victim while the order of protection was in place. Defendant asserts that in June 2021—almost a year before the incidents at issue

in this case—Victim "gave in" and permitted their youngest child to spend the summer with Defendant in Florida. According to Defendant, Victim flew to Florida at the end of the summer with their older child and spent a week with Defendant to try to mend the relationship. Defendant also states that he relied on Victim "reaching out in an on and off again relationship." Defendant claims these interactions demonstrate that Victim violated the order of protection and could have allowed the jury to infer that Victim induced Defendant to violate the order.

**{10}** This Court considered a similar argument in *State v. Silva*, 30,204, mem. op. (N.M. Ct. App. July 15, 2011) (nonprecedential), in which we affirmed the district court's refusal to provide the defendant's request for "mutual violation" language. In *Silva*, the defendant argued that because the victim answered the phone and spoke to him when he called, the jury should be instructed on the victim's mutual violation of the order of protection. *Id.* The district court rejected this argument on grounds that the order of protection was nonmutual, as well as that the victim was "a passive recipient of the phone calls and was not ordered not to talk to him." *Id.*

**{11}** Here, the order of protection was similarly nonmutual. While Defendant points to language in the order warning that Victim "should refrain from any act that would cause the restrained party to violate [the] order," the order also makes clear that it is not creating a mutual order of protection, stating,

> While this order of protection is in effect, the protected party should refrain from any act that would cause the restrained party to violate this order. This provision is not intended to and does not create a mutual order of protection. Under [NMSA 1978,] Section 40-13-6(D) [(2013)] only the restrained party can be arrested for violation of this order.

As was the case in *Silva*, Victim's actions were not constrained by the order of protection and we are not persuaded that Victim's trip to Florida or her "reaching out" amount to violations of the order. To the extent Defendant argues that Victim "caused" him to violate the order of protection, he has not established any action by Victim that brought Defendant to Victim's home on May 2nd. Similar to the circumstance in *Silva*, Victim here was a passive recipient of an unwelcome communication—here unwanted visits at her home—from Defendant. We likewise find Defendant's reliance on cases from other jurisdictions unpersuasive and inapplicable to the facts of the case before us. As such, we conclude that the trial court did not err in declining Defendant's request to include mutual violation language in the aggravated stalking instruction.

## B.    Deadly Weapon

**{12}** Defendant also contends the second alternative instruction was erroneous because it omitted additional language requiring the jury to determine that the knife was a deadly weapon. Because this issue was not preserved, our review is for fundamental error. *See Benally*, 2001-NMSC-033, ¶ 12. To determine whether fundamental error has occurred, we employ a two-step process: first we must determine "whether error

occurred," and, if so, we must then determine "whether the error is fundamental." *State v. Ocon*, 2021-NMCA-032, ¶¶ 7-8, 493 P.3d 448.

**{13}** At the first step, we agree with Defendant that error occurred because the jury was not asked to determine whether Defendant's knife was a deadly weapon. *See* § 30-3A-3.1(A)(3) (stating that a defendant may be convicted for aggravated stalking when the defendant engages in stalking while in possession of a deadly weapon). UJI 14-333 correctly recognizes that where, as here, the weapon at issue is not specifically listed as a per se "deadly weapon" in NMSA 1978, Section 30-1-12(B) (1963), the jury must be instructed that Defendant possessed the knife "with the intent to use it as a weapon and a [knife], when used as a weapon, is capable of inflicting death or great bodily harm." UJI 14-333(2). Accordingly, the jury should have been instructed "(1) that the defendant must have possessed the object or instrument with the intent to use it as a weapon, and (2) the object or instrument is one that, if so used, could inflict dangerous wounds." *State v. Anderson*, 2001-NMCA-027, ¶ 32, 130 N.M. 295, 24 P.3d 327; *see also State v. Nick R.*, 2009-NMSC-050, ¶ 43, 147 N.M. 182, 218 P.3d 868 (observing that not all knives are deadly weapons and that a pocketknife is not a per se deadly weapon).

**{14}** Nonetheless, we conclude the error was not fundamental. *See Ocon*, 2021-NMCA-032, ¶ 8. Defendant does not appear to dispute that the knife, when used as a weapon, was capable of inflicting death or great bodily harm. *See* UJI 14-333(2). Instead, Defendant appears to argue that there was no evidence introduced that tended to establish that he intended to use the knife as a weapon. Defendant argues that he possessed a kitchen knife with no criminal intent, that Victim did not have any reasonable apprehension, and there was no temporal nexus between his possession of the knife and the act of stalking Victim. Contrary to Defendant's assertions, Victim testified that while holding the knife, Defendant threatened to kill both of them. Victim further testified that because of Defendant's actions, she was scared for her life. As well, the first responding officer testified that Victim showed him the knife and said that Defendant had used it to threaten her. A photograph of the knife was entered into evidence for the jury to review. Given the facts and evidence developed at trial, including the testimony of Victim and the responding officer, as well as the photograph of the knife that was entered into evidence and shown to the jury, we conclude that, if properly instructed, the jury undoubtedly would have found that Defendant possessed the knife "with the intent to use it as a weapon and [the] knife, when used as a weapon, is capable of inflicting death or great bodily harm." *See* UJI 14-333(2); *Ocon*, 2021-NMCA-032, ¶ 20.

**{15}** We are likewise unpersuaded by Defendant's suggestion that the jury, if properly instructed, might have concluded that he did not intend to use the knife as a weapon because the jury acquitted him of aggravated burglary, aggravated assault, and aggravated battery. Defendant suggests that the jury might have concluded that he simply possessed the kitchen knife on the same day that he stalked Victim. However, this version of events is not grounded in the facts and evidence developed during trial. In light of the foregoing, we conclude that the error in instructing the jury on the deadly weapon alternative does not amount to fundamental error under the circumstances.

## II.      False Imprisonment

**{16}**     Defendant claims that the error in the aggravated stalking jury instruction also "infected jury deliberations on conflicting testimony as to [C]ount 7 [false imprisonment,] whether [Defendant] knew he had no authority to restrain or confine [Victim]." Defendant acknowledges that this argument, too, should be reviewed for fundamental error.

**{17}**     Defendant asserts that "if violations of the protection order were a complete defense to his violation, then the jury might have viewed his otherwise benign behavior with [Victim] and their child that day in a different light." Because we have concluded the district court did not err in declining to include "mutual violation" language, this argument presents no basis for imputing fundamental error with respect to the false imprisonment charge.

**{18}**     As for the error in instructing the jury on the deadly weapon alternative, Defendant argues that "the factual basis of all of the charges was bound up with the presence of the knife." However, the false imprisonment charge did not turn on Defendant's use of a knife. Rather, the jury needed to find only that (1) "[D]efendant restrained or confined [Victim] against her will, and (2) [D]efendant knew that he had no authority to restrain or confine [Victim]." Defendant has not explained how the omission of additional language requiring the jury to determine that the knife was a deadly weapon for purposes of the aggravated stalking conviction can be said to have "infected" the jury's deliberations on the false imprisonment charge. Given Defendant's failure to develop this argument, we are presented with no basis to conclude that fundamental error occurred with respect to Defendant's conviction for false imprisonment. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (declining review of undeveloped arguments where the party does not explain their arguments or cite to the record to support their assertions).

## III.      Double Jeopardy

**{19}**     Defendant claims that his convictions for deprivation of the property of a household member and interference with communications violate his right to be free from double jeopardy. Defendant argues that the State relied on his act of taking Victim's cell phone to convict him of both offenses. We review Defendant's double jeopardy challenge de novo. *See State v. Begaye*, 2023-NMSC-015, ¶ 11, 533 P.3d 1057.

**{20}**     Because Defendant contends that a single act resulted in multiple charges under different statutes, we follow the two-part test adopted in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223, to evaluate his double description claim. *See Begaye*, 2023-NMSC-015, ¶ 13. "First, we assess whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes." *Id.* (internal quotation marks and citation omitted). "Second, we examine the statutes at issue to determine whether the [L]egislature intended to create separately punishable offenses." *Id.* (internal quotation marks and citation omitted). "Only if the first part of the test is

answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Id.* (internal quotation marks and citation omitted).

**{21}** In this case, Defendant was accused of taking Victim's cell phone, car keys, and car. Defendant maintains that the cell phone was clearly used to establish his conviction for interference with communications as charged in Count 9, and the State failed to identify any particular property to establish the crime of deprivation of property of a household member as charged in Count 8. The State acknowledges that neither the jury instructions nor arguments of counsel directed the jury to any particular personal property for Count 8, but argues that the reference to personal property in Count 8 "must be read reasonably as referring to the vehicle keys." Nevertheless, even if we were to conclude that the conduct was unitary because both convictions could have been based on the taking of the cell phone, *see State v. Sanchez-Trillo*, A-1-CA-41072, mem. op. ¶¶ 10-13 (N.M. Ct. App. Oct. 30, 2024) (nonprecedential), Defendant has not offered, much less developed, any legal or factual argument as to the second prong of the *Swafford* test. We are unwilling to examine statutes in order to ascertain legislative intent ourselves in the first instance given the lack of argument by Defendant in this regard; therefore, we decline to consider the merits of Defendant's double jeopardy argument. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them. This creates a strain on judicial resources and a substantial risk of error. It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments." (citation omitted)).

**{22}** Our conclusion notwithstanding, we note that future habeas proceedings could supply an additional avenue for any further development of the argument Defendant seeks to advance. *See State v. Graham*, 2003-NMCA-127, ¶ 8, 134 N.M. 613, 81 P.3d 556 (observing parenthetically that "when the record does not support the factual basis for a contention that may be raised for the first time on appeal, the preferred method of resolution of the issue is in habeas corpus proceedings"), *rev'd on other grounds*, 2005 NMSC-004, 137 N.M. 197, 109 P.3d 285; *see, e.g.*, *Kersey v. Hatch*, 2010-NMSC-020, ¶ 26, 148 N.M. 381, 237 P.3d 683 (addressing a double jeopardy argument on review of habeas proceedings); *State v. Nunez*, 2000-NMSC-013, ¶ 98, 129 N.M. 63, 2 P.3d 264 (stating that "the double jeopardy defense may be raised at any time, both before and after judgment").

## IV.    Serious Violent Offenses for Purposes of the EMDA

**{23}** Lastly, Defendant challenges the district court's designation of his false imprisonment and aggravated stalking convictions as serious violent offenses for purposes of the EMDA, thus limiting Defendant's good time deductions to four days per month of time served. *See* § 33-2-34(A)(1). "A 'serious violent offense' falls into one of two categories: per se or discretionary." *State v. Montano*, 2024-NMSC-019, ¶ 2, 557 P.3d 86. "A per se serious violent offense is any one of fourteen specifically enumerated

crimes[, whereas a] discretionary serious violent offense is one of fifteen specifically enumerated crimes that, in considering "the nature of the offense and the resulting harm," the sentencing court has the discretion to designate as a serious violent offense." *Id.* (citing Section 33-2-34(L)(4)(a)-(n)). In this case, neither of the challenged offenses are per se serious violent offenses, and Defendant's challenges relate to the district court's determination that these crimes fall within the court's discretionary authority. *See State v. Solano*, 2009-NMCA-098, ¶ 7, 146 N.M. 831, 215 P.3d 769.

## A.  False Imprisonment

**{24}**  Defendant first argues that the district court erred in finding that false imprisonment was a serious violent offense because it is not listed as either a per se or a discretionary serious violent offense in Section 33-2-34(L)(4). *See Montano*, 2024-NMSC-019, ¶¶ 2, 10 (stating that criminal conduct that is not listed as either a per se or discretionary serious violent offense in Section 33-2-34(L) is a nonviolent offense); *see also State v. Loretto*, 2006-NMCA-142, ¶ 9, 140 N.M. 705, 147 P.3d 1138 ("A defendant's good time eligibility under the EMDA cannot be reduced for a crime that is not enumerated in that statute."). The State concedes that the district court erred in designating the false imprisonment conviction as a serious violent offense, noting that the designation may have been a clerical error, and agrees that the matter should be remanded to the district court for correction of Defendant's judgment and sentence as to this count. Although we are not bound by the State's concession, we accept it here. *See generally State v. Palmer*, 1998-NMCA-052, ¶ 12, 125 N.M. 86, 957 P.2d 71 (stating the appellate court must review the record regardless of the state's concession).

## B.  Aggravated Stalking

**{25}**  Defendant also contends the district court's findings were "insufficient as a matter of law to support designating the aggravated stalking [conviction] as a serious violent offense" because the district court did not make a specific finding as to whether the underlying offense was committed in a physically violent manner. Because aggravated stalking is listed as a discretionary serious violent offense in Section 33-2-34(L)(4)(o)(6), we review the district court's findings and serious violent offender designation for an abuse of discretion. *See Solano*, 2009-NMCA-098, ¶ 7.

**{26}**  In *Solano*, this Court reaffirmed that "[i]n order to designate the conduct of a particular defendant as a serious violent offense under the discretionary category, the district court must determine that the crime was 'committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm.'" 2009-NMCA-098, ¶ 10 (quoting *State v. Morales*, 2002-NMCA-016, ¶ 16, 131 N.M. 530, 39 P.3d 747)). This is referred to throughout New Mexico caselaw as "the *Morales* standard."

**{27}**  In this case, the district court found that Defendant's stalking behavior occurred over a significant period of time and caused significant mental and emotional trauma to Victim. While the district court's findings as to the mental and emotional trauma Victim

suffered as a result of Defendant's long history of stalking and controlling behavior are sufficient to conclude that the crime was committed "either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm," *see Morales*, 2002-NMCA-016, ¶ 16, Defendant advocates for reversal based on the lack of a specific finding regarding the first part of the *Morales* standard—that the aggravated stalking was committed in a physically violent manner.

**{28}**     In response, the State asserts that the district court's findings were adequate under *Morales* because there was a sufficient basis in the record to support a conclusion that the offense was committed in a physically violent manner. The State also contends that the district court's reliance on a sentencing memorandum detailing Defendant's previous behavior toward Victim suffices as an "implicit" finding that Defendant committed the offense in a physically violent manner. We disagree with the State's second contention as the sentencing memorandum focuses on Defendant's habitual offender status and does not address or establish whether the aggravated stalking conviction at issue here can be said to have been committed in a physically violent manner.

**{29}**     While this Court has said that "the trial court need not express its findings in the *Morales* language as long as the findings are consistent with the *Morales* standard," *State v. Montoya*, 2005-NMCA-078, ¶ 8, 137 N.M. 713, 114 P.3d 393, in this case the district court's "findings on serious violent offense designation" and the court's oral ruling are silent on whether the underlying offense was committed in a physically violent manner. Nevertheless, there may well be a sufficient basis in the record to establish that the aggravated stalking in this case was committed in a physically violent manner. We remand this case to the district court for reconsideration of whether the offense was a serious violent offense and to enter findings consistent with the *Morales* standard. *See State v. Loretto*, 2006-NMCA-142, ¶ 21, 140 N.M. 705, 147 P.3d 1138.

**CONCLUSION**

**{30}**     Based on the foregoing, we affirm Defendant's convictions but remand this case to the district court for (1) correction of Defendant's judgment and sentence as to the false imprisonment conviction, and (2) reconsideration of whether the aggravated stalking conviction is a serious violent offense under the EMDA.

**{31}   IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**SHAMMARA H. HENDERSON, Judge**