******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ALEXANDER, J., with whom DANNEHY and BRIGHT, Js., join, dissenting. The trial court found probable cause to believe that the defendant, Aaron Moore, conspired with another individual to commit murder on the basis of allegations in an arrest warrant affidavit that the defendant and his coconspirator each used a firearm to open fire on a parked car in broad daylight in Hamden, killing a person who was seated inside. The defendant had been arrested and charged with, among other crimes, conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. The trial court set the defendant's bond at $1 million and granted the state's petition for a 30 percent cash bond pursuant to General Statutes § 54-64a (c) (2).[1] Today, the majority grants the defendant's petition for bail review and requested relief on the ground that murder, and specifically conspiracy to commit murder, is not a "serious firearm offense," as defined by General Statutes § 53a-3 (24), which renders the 30 percent cash bond option provided by § 54-64a (c) (2) not available to the trial court in setting the defendant's bond, even when it is alleged that he committed those crimes by the discharge and use of a firearm.

I respectfully disagree with the majority's conclusion that § 53a-3 (24) plainly and unambiguously compels this conclusion. In my view, General Statutes § 1-2z allows review of the legislative history because (1) the statutory language is ambiguous, and (2) even if the language is deemed to be plain and unambiguous, it nonetheless leads to absurd results. The legislative history of § 53a-3 (24), which was enacted as No. 23-53, § 36, of the 2023 Public Acts (P.A. 23-53), aptly titled "An Act Addressing Gun Violence," indicates that the legislature intended the 30 percent cash bond provision in § 54-64a (c) (2) to address a spate of gun violence

_____

[1] Beyond these background facts, I agree with the majority's detailed recitation of the facts and procedural history in this matter.

in our state's major cities, in response to a proposal from the mayors and police chiefs from those municipalities. Accordingly, I interpret §§ 53a-3 (24) and 54-64a (c) (2) to effectuate that legislative purpose and conclude that those statutes allow a trial court to set a 30 percent cash bond for the crime of conspiracy to commit murder when it is alleged that the overt act establishing an essential element of the crime involved the discharge or use of a firearm, or that the defendant was armed with and threatened the use of a firearm. Because I would deny the relief requested, I respectfully dissent.

I

The issue presented in this case is one of statutory interpretation governed by § 1-2z, under which we ascertain the meaning of a statute "in the first instance . . . from the text of the statute itself and its relationship to other statutes. If . . . the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence . . . shall not be considered. . . . Our analysis fundamentally seeks to ascertain and give effect to the apparent intent of the legislature." (Citations omitted; internal quotation marks omitted.) *FuelCell Energy, Inc.* v. *Groton*, 350 Conn. 1, 6, 323 A.3d 268 (2024). This is a question of law over which our review is plenary. See id.

As required by § 1-2z, I begin with the relevant statutory language. Section 54-64a (c) (2) provides in relevant part: "*When any arrested person charged with the commission of a serious firearm offense, as defined in section 53a-3*, other than a person described in subdivision (1) of this subsection, is presented before the Superior Court, the court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested

person in court and that the safety of any other person will not be endangered . . . (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. The prosecutorial official may petition the court to deem such person a serious risk to the safety of another person or persons. *The prosecutorial official may present any information developed by federal, state and local law enforcement agencies in the course of a criminal investigation or enforcement action, including, but not limited to, social media posts, pictures or videos threatening violence, claiming responsibility for violence or suggesting possession of a firearm.* If the court finds that the arrested person poses a serious risk to the safety of another person or persons, the arrested person may only be released pursuant to subparagraph (C) or (D) of this subdivision *and the arrested person shall be required to deposit at least thirty per cent of any bond amount directly with the court. . . .*"[2] (Emphasis added.)

Section 53a-3 (24) defines the term "serious firearm offense" as "a violation of [General Statutes §§] 29-36, 29-36a or 53-202w, possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful, *or any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm . . . .*" (Emphasis added.) This statutory definition under § 53a-3 (24) breaks into two parts. First, it implicates

---

[2] In contrast to the permissive language of § 54-64a (c) (2), subdivision (1) of § 54-64a (c) provides that the prosecutorial official "shall petition" for a 30 percent cash bond for a person who is charged with a serious firearm offense and is a "serious firearm offender" or has had prior convictions of certain offenses or combinations of offenses. Both subdivisions (1) and (2) of § 54-64a (c) apply to a person "charged with the commission of a serious firearm offense, as defined in [§] 53a-3 . . . ."

enumerated offenses that pertain to prohibited conduct involving firearms and ammunition, namely, "possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful," along with (1) alteration of a firearm identification mark, serial number, or name in violation of § 29-36, (2) manufacturing violations under § 29-36a, and (3) the sale, transfer, or possession of large capacity magazines in violation of § 53-202w. General Statutes § 53a-3 (24). Second, it contains a residual clause that includes "any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm . . . ." General Statutes § 53a-3 (24).

The dispositive issue in this case concerns the residual clause and whether conspiracy to commit murder, when it is alleged that the overt act in furtherance of the conspiracy was the use of a firearm, is a "crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm . . . ." General Statutes § 53a-3 (24). This issue turns on whether the court is restricted to the elements in the text of the charged statute in making that determination under the residual clause or whether, consistent with how our trial judges set conditions of release in every criminal case, it may consider the act that is alleged to have satisfied an essential element of the charged offense.

In discerning the meaning of the phrase "essential element" in § 53a-3 (24), it is appropriate to begin with our recent decision in *State* v. *King*, 346 Conn. 238, 288 A.3d 995 (2023). In *King*, we construed the phrase "essential elements" as used in General Statutes § 14-227a (g), which provides for enhanced penalties for persons convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a) who have either prior convic-

tions for violating § 14-227a (a) or a "conviction in any other state of any offense *the essential elements of which are determined by the court to be substantially the same as* [*those in § 14-277a (a) (1) or (2)*] . . . ." (Emphasis added.) Citing definitions from both Black's Law Dictionary and Webster's New World Dictionary of the American Language, we explained that the phrase "essential elements" in § 14-227a (g) means "the basic and necessary parts of the crime, including the actus reus, mens rea, and causation . . . ." Id., 249.

## A

With that definition in mind, I turn to the question of whether the residual clause in § 53a-3 (24) is ambiguous. "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Bischoff*, 337 Conn. 739, 746, 258 A.3d 14 (2021). Establishing ambiguity for purposes of § 1-2z is a "relatively low" bar; *Bennett* v. *New Milford Hospital, Inc.*, 300 Conn. 1, 15, 12 A.3d 865 (2011); because it requires only that the multiple proffered readings of the statute be plausible. See, e.g., *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, 350 Conn. 525, 548, 325 A.3d 196 (2024).

In my view, the residual clause in § 53a-3 (24) contains an ambiguity with respect to the issue presented because, when considered in context, it is subject to two plausible readings. On the one hand, as the defendant argues, the use of the phrase "essential element" might be read to encompass only the text of the charged statute to determine whether it includes the discharge, use, or the act of being armed with and threatening the use of a firearm as a statutory element of the offense, and not to allow consideration of "information beyond the elements of the crimes charged in the information . . . in determining whether a defendant is charged

with a 'serious firearm offense' . . . ." It is, however, "a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Internal quotation marks omitted.) *Planning & Zoning Commission* v. *Freedom of Information Commission*, 316 Conn. 1, 12–13, 110 A.3d 419 (2015). In contrast to *King*, in which the "essential elements" language of § 14-227a (g) required a comparison of § 14-227a and a Florida statute; see *State* v. *King*, supra, 346 Conn. 249–52; the "essential element" language of the residual clause in § 53a-3 (24) must be read in connection with the portion of that very definition that specifically enumerates several offenses that are within the ambit of the statute, namely, violations of §§ "29-36, 29-36a or 53-202w, possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful . . . ." It also must be considered in connection with subdivision (1) of § 54-64a (c), which cross-references a litany of specifically enumerated offenses of which a previous conviction will require the court to set a 30 percent cash bond for a person charged with committing a serious firearm offense, including murder in violation of § 53a-54a. Had the legislature intended to cabin the applicability of § 53a-3 (24) only to enumerated offenses in our Penal Code for which the discharge, use, or the act of being armed with and threatening the use of a firearm is a textual requirement, without consideration of *how* the essential elements of the charged criminal conduct are satisfied, it could have omitted the broad language of the residual clause and referred to these offenses with the specificity that it used elsewhere in both the definition of § 53a-3 (24) and in the related provision, § 54-64a (c) (1). See *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 350 Conn. 539–40. Finally, this ambiguity is amplified by language in § 54-

64a (c) expressly contemplating that courts will consider evidence beyond the statutory language in making the bond determination—as they do in setting conditions of release in every criminal case. Subdivision (2) of § 54-64a (c) allows the court to consider "any information" suggesting that the arrested person is a "serious risk to the safety of another person or persons . . . ." Subdivision (3) of § 54-64a (c) directs courts determining conditions of release to consider "[t]he nature and circumstances of the offense" and "the weight of the evidence against the arrested person . . . ."[3]

The majority, after surveying the areas in our case law and state statutes in which the phrase "essential element" has been used, posits that the phrase means "the basic legal requirements sufficient to prevail on either a civil or criminal claim." No one is disputing that this is the meaning of that phrase. In the context of § 53a-3 (24), however, the question is how the essential element requirement is satisfied; does a trial court, in determining whether the arrested person was charged with committing a serious firearm offense, only look at the bare, statutory text, or may it consider the person's underlying conduct by, for example, examining the arrest warrant affidavit, to determine whether the state intends to prove an essential element of the charged crime by showing that the person in fact "discharged, used or was armed with and threatened the use of a firearm . . . ." General Statues § 53a-3 (24). Given that bond determinations always require a court to examine the charging documents and arrest warrant affidavit, it is a reasonable interpretation of the residual clause that the legislature expected courts, when setting bond, to look to those documents to see if the essential element

---

[3] This language in § 54-64a (c) (3) is consistent with the more broadly applicable provision of § 54-64a (b) (2). See Practice Book § 38-4 (d) (setting forth criteria contained in § 54-64a (c) (3)); see also *State* v. *Pan*, 345 Conn. 922, 955, 291 A.3d 82 (2022) (discussing hearing procedures).

requirement of the residual clause has been satisfied. Because the statute is ambiguous on this point, this court may examine extratextual sources to resolve the ambiguity.

B

In the alternative, if the plain and unambiguous statutory language yields absurd or unworkable results, the court may review the legislative history pursuant to § 1-2z. See, e.g., *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 91 n.11, 282 A.3d 1253 (2022). "We have interpreted § 1-2z to instruct Connecticut's courts, when construing statutory language, to eschew those interpretations that, although not literally impossible to effectuate, would be so bizarre, impracticable, or contrary to common sense that one cannot reasonably assume that they reflect the considered intent of the legislature." *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 350 Conn. 546; see *State* v. *Montano*, 557 P.3d 86, 93 (N.M. 2024) ("The historical underpinnings and universal acceptance of the absurdity doctrine demonstrate that these values are rooted in the rule of law, which espouses predictability of the law and the coherence of the legal system as a whole. . . . Understood in this sense, the literal application of a statute is absurd when it contradicts the values of rationality, reasonableness, and common sense." (Citation omitted; internal quotation marks omitted.)); V. Dougherty, "Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation," 44 Am. U. L. Rev. 127, 162 (1994) ("A lay reader may look at the words of a statute and automatically question, rather than accept, an understanding of the words that would result in absurdity. That person, after reading the statute, may perceive a possible meaning that would lead to an absurd result, and immediately say to himself, '[t]hat makes no sense

at all—it can't mean that.' "). In contrast to the finding of ambiguity, deference to the legislature's role as the primary lawmaking body means that concluding that the result of applying the plain meaning of a statute is "something the [l]egislature could not possibly have intended is a *high* bar." (Emphasis added; internal quotation marks omitted.) *State* v. *Montano*, supra, 94; see *PPC Realty, LLC* v. *Hartford*, 350 Conn. 347, 360, 324 A.3d 780 (2024). The high bar to establish absurdity or unworkability is a corollary of the principle that the court may not rewrite an otherwise clear statute to achieve a result that it deems more sensible. *PPC Realty, LLC* v. *Hartford*, supra, 360.

Several consequences discussed at oral argument before this court bear out the fact that the defendant's "plain meaning" interpretation of the statute, "although not literally impossible to effectuate, would be so . . . contrary to common sense that one cannot reasonably assume that [it] reflect[s] the considered intent of the legislature." *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 350 Conn. 546; see *Rivers* v. *New Britain*, 288 Conn. 1, 19 n.17, 950 A.2d 1247 (2008) (under § 1-2z, court may consider apparent purpose of statute, as evidenced by text, in considering whether literal reading of plain language is absurd or unworkable). The first indication that the defendant's plain meaning interpretation has cleared the high bar of absurdity is that it renders the residual clause in § 53a-3 (24) almost meaningless. The underlying premise of the defendant's argument is that murder is not a serious firearm offense under the residual clause because—considering only the statutory elements of the crime charged in the information—murder can be committed without discharging, using, or being armed with and threatening the use of a firearm. Therefore, according to the defendant, the residual clause is not satisfied because a firearm is not required to satisfy an

essential element of murder, and the court may not go beyond the statutory violations alleged in the information.

It is well settled that a court "may consider hypothetical scenarios beyond the facts of the case before [it] in determining whether a construction of the plain language of a statute will lead to an absurd result." *Commission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342 Conn. 25, 39 n.11, 268 A.3d 630 (2022). My review of our criminal statutes reveals that the defendant's interpretation would leave only three statutes subject to the residual clause, two of which do not implicate acts of violence.[4] See General Statutes § 53-203 (misdemeanor of unlawful discharge of firearm); General Statutes § 53a-59 (a) (5) (assault in first degree by means of discharge of firearm); General Statutes § 53a-217e (d) (1) (A) and (B) (negligent hunting in third degree). Although there are other statutes that contemplate the commission of an offense via the discharge, use, or the act of being armed with and threatening the use of a firearm, those statutes provide additional alternatives for violating the statute, such as a defendant's representation by words or conduct that he possesses a firearm and, therefore, fall beyond the defendant's interpretation. See, e.g., General Statutes § 53a-55a (a) (manslaughter in first degree with firearm); General Statutes § 53a-56a (a) (manslaughter in

---

[4] In its brief and at oral argument before this court, the state identified two additional statutes as being subject to the defendant's interpretation of the residual clause in § 53a-3 (24), specifically, General Statutes §§ 53a-55a (a) and 53-204. However, one of those statutes, § 53a-55a (a), manslaughter in the first degree with a firearm, can also be committed if the person "represents by his words or conduct" that he possesses a firearm. General Statutes § 53a-55a (a). In addition, § 53-204, hunting or discharging a firearm from a public highway, does not specify that the prohibited hunting must be with a firearm. Because both statutes include conduct that does not require the discharge, use, or the act of being armed with and threatening the use of a firearm, they would not satisfy the defendant's interpretation of a serious firearm offense.

second degree with firearm); General Statutes § 53a-60a (a) (assault in second degree with firearm); General Statutes § 53a-61aa (a) (3) (threatening in first degree); General Statutes § 53a-92a (a) (kidnapping in first degree with firearm).

Using § 53a-55a (a) as an example, the consequence of this interpretation is that, when manslaughter in the first degree is charged, the court, by looking only at the statute and the information, does not know whether, during the commission of the offense, the defendant (1) used a firearm, (2) was armed with and threatened the use of a firearm, or (3) displayed or represented by this words or conduct that he possessed a firearm. Because that statute is not broken into subdivisions, without looking to the underlying conduct as alleged in the arrest warrant affidavit, it is impossible for the court to determine whether an "essential element" of the crime is "that the person discharged, used or was armed with and threatened the use of a firearm . . . ." General Statutes § 53a-3 (24). The defendant's interpretation would mean that, because § 53a-55a (a) and other similarly formulated statutes are overinclusive and do not *require* that an essential element of the offense be that the person discharged, used, or was armed with and threatened the use of a firearm, such statutes can *never* be deemed serious firearm offenses, regardless of the factual predicate for the charges.

Reading the residual clause so narrowly leads to an absurd result insofar as it results in only one crime of violence being considered a serious firearm offense. The use of a residual clause for such a limited purpose is not rational and defies common sense. Indeed, applying that definition to other statutory provisions would mean, for example, that provisions requiring the return to the custody of the Department of Correction of parolees charged with a serious firearm offense would not

apply to a person arrested for murder. See General Statutes 54-127; see also General Statutes § 53a-32 (d) (revocation of probation or conditional discharge for "violation consist[ing] of the commission of a serious firearm offense or the defendant is a serious firearm offender"); General Statutes § 54-64f (c), (d) and (f) (revocation of release).

Moreover, the application of the definition as suggested by the defendant leads to absurd results because it makes eligibility for the 30 percent cash bond totally dependent on the skill of the shooter and does so in a very odd way. The expert shooter who murders his target would not be eligible for the 30 percent cash bond. The bad shooter who is charged with attempt to commit murder for spraying bullets in a neighborhood without hitting his target would not be eligible for the 30 percent cash bond. The expert shooter who causes "serious physical injury" to the victim by means of a "deadly weapon" would not be eligible for the 30 percent cash bond when charged with assault in the first degree in violation of § 53a-59 (a) (1). Yet, that same shooter would be eligible for the 30 percent cash bond if he was charged with causing "physical injury" to a victim by "discharge of a firearm" under § 53a-59 (a) (5). Of course, each of those shooters poses the same public safety threat that P.A. 23-53, § 36, was intended to address. Cf. *Desrosiers* v. *Diageo North America, Inc.*, 314 Conn. 773, 785–86, 105 A.3d 103 (2014) (to construe employment discrimination statute not to apply to discrimination based on perceived disability, when employer engaged in same discriminatory act with same discriminatory motive as discrimination based on actual disability, would lead to bizarre result); *State* v. *Courchesne*, 296 Conn. 622, 708, 998 A.2d 1 (2010) ("judicial abrogation of the born alive rule would lead to a result that is both unprecedented and absurd; in that event, a person who fatally injures a fetus that

dies in utero would be subject to severe criminal penalties under [No. 03-21 of the 2003 Public Acts], whereas that same person would be subject to no criminal sanction for inflicting those same injuries if the fetus is born alive and subsequently dies from the injuries inflicted in utero" (emphasis omitted)). Given the apparent absurdity of the plain meaning interpretation of § 53a-3 (24), along with what I believe is an ambiguity, consideration of extratextual sources is appropriate to resolve the meaning of that statute. See General Statutes § 1-2z.

II

The legislative history of § 53a-3 (24) reveals that it was enacted along with § 54-64a (c) as part of P.A. 23-53.[5] Public Act 23-53 was a comprehensive measure that implemented various amendments to Connecticut's statutory scheme aimed at reducing and preventing gun violence and mass shootings by eliminating ghost guns, increasing restrictions on assault weapons and large capacity magazines, and addressing the prevalence of repeat firearm offenders in the state's major cities. See 66 H.R. Proc., Pt. 7, 2023 Sess., pp. 4761–63, remarks of Representative Steven Stafstrom. The legislative history illustrates that the primary purpose of the legislation was to address urban gun violence by making conditions of pretrial release more onerous for persons who are believed to have committed a crime with a firearm, along with creating dedicated gun dockets to speed up the prosecution of firearm cases. See id., pp. 4761–62, 4834, 4841–42, remarks of Representative Stafstrom; see also 66 S. Proc., Pt. 5, 2023 Sess., p. 3709, remarks of Senator Martin M. Looney.

In his summary of the relevant portion of the legislation, its cosponsor, Representative Stafstrom, explained that the 30 percent cash bond provision was part of a

---

[5] See Public Acts 2023, No. 23-53, §§ 36 and 38.

proposal brought to the legislature by a group of the state's major city mayors and police chiefs to "[create] a definition of serious firearm offenses, which are a number of offenses that are already in our [G]eneral [S]tatutes and [to] reclassif[y] them as serious firearm offenses" in order to create "increased consequences upon arrest," such as revocation of probation or imposition of a "higher bail amount."[6] 66 H.R. Proc., supra, pp. 4841–42. This provision "crack[s] down on repeat firearm offenders" and gives "judges more tools to set higher bail . . . ." Id., pp. 4761–62, remarks of Representative Stafstrom. Senator Looney, speaking favorably of the legislation, expressed that it provides for "a very significant enhancement of penalties for people who are designated as having committed and are convicted of what are defined under the [legislation] as serious firearm offense[s]. And someone designated as a serious firearm offender will have more stringent release conditions set, will allow or require in some cases, prosecutors to petition the court for bond amounts of up to 30 [percent]. That means the person will have to come up with an actual 30 [percent] of the posted bond, which means many more people are going to be held without making bail . . . ." 66 S. Proc.,

---

[6] Other legislators, even those opposed to other substantial portions of the wide-ranging legislation, spoke favorably of this portion and discussed the violent crime statistics that the city mayors and police chiefs had presented to the Judiciary Committee, and described those officials as being "on the battleground . . . where most of [the] gun crimes are being committed" by a very small portion of those cities' residents. 66 S. Proc., supra, p. 3590, remarks of Senator Eric Berthel; see also id., p. 3693, remarks of Senator Robert C. Sampson (commenting that "[t]he sections [of the legislation] that came to us from the big city mayors . . . are positive steps toward actually fighting crime"); 66 H.R. Proc., supra, p. 4778, remarks of Representative Doug Dubitsky (observing that "the mayors and the police chiefs that came in and testified asked us for certain provisions in the law . . . to make it harder for the [ninety] people in New Haven and the small number of also identified people in each of the other big cities . . . to commit crimes," and to "make the law easier to prosecute these people and to keep them off the street").

supra, p. 3709. This legislative history reflects that the overall purpose of the legislation, and this provision specifically, was to reduce gun violence and to impose stricter pretrial release requirements on individuals who are believed to have committed an offense with a firearm.

In light of the legislative policy that this provision was designed to implement, this court must consider whether any of the constructions discussed in this opinion would frustrate an evident legislative intent. It is well established that "reviewing courts should not construe statutes in disregard of their context and in frustration of the obvious legislative intent or in a manner that is hostile to an evident legislative purpose . . . or in a way that is contrary to common sense." (Internal quotation marks omitted.) *State* v. *Banks*, 321 Conn. 821, 842, 146 A.3d 1 (2016). With the prevention of homicides and gun murders of all kinds being one of the goals of P.A. 23-53,[7] there is nothing in the legislative history to indicate that the legislature intended to exempt the most serious felony in our Penal Code, when committed with a gun, from inclusion as a serious firearm offense. This is particularly so, given the legislature's evident understanding from the text of § 54-64a (c) (2) that the trial judge necessarily must consider the underlying facts, as stated in the arrest warrant affidavit, in setting the base bond amount to which the 30 percent cash bond would apply. Thus, I understand the legislature to have used the phrase "essential element" more broadly and to have intended the term "serious firearm offense" to encompass those criminal acts in which an essential element, the actus reus; see *State* v. *King*, supra, 346 Conn. 249; has been satisfied by the discharge, use, or the act of being armed with

---

[7] See, e.g., 66 S. Proc., supra, pp. 3521–22, remarks of Senator Robert C. Sampson; 66 H.R. Proc., supra, p. 4907, remarks of Representative Robert D. Godfrey.

and threatening the use of a firearm, regardless of whether the language of the charged statute includes those terms.

To this end, I respectfully disagree with the majority's observation that the legislature may have consciously omitted offenses such as murder, or conspiracy to commit murder as in this case, as serious firearm offenses because it reasonably could have presumed that the bonds being set for those offenses are already adequate to ensure the presence of the accused and the safety of the community in accordance with § 54-64a (b). The majority's construction of § 53a-3 (24) requires trial judges to set even higher than usual base bonds in homicide or attempted homicide cases to achieve the purpose of the 30 percent cash bond, which creates reasonableness issues under article first, § 8, of the Connecticut constitution, such as those considered in *State* v. *Pan*, 345 Conn. 922, 938–39, 291 A.3d 82 (2022). See *State* v. *Menillo*, 159 Conn. 264, 269–70, 268 A.2d 667 (1970) (observing that "[t]he fundamental purpose of bail is to ensure the presence of an accused throughout all proceedings" and that "the bail provision of [article first, § 8, of the Connecticut constitution] makes clear that it was intended that in all cases, even capital cases not falling within the exception, bail in a reasonable amount should be ordered," although "a reasonable amount is not necessarily an amount within the power of an accused to raise"). Accordingly, I respectfully disagree with the majority's decision to adopt the defendant's construction of § 53a-3 (24), which excludes many crimes, including murder, attempt to commit murder, and conspiracy to commit murder—even when those crimes are committed with a firearm—from the definition of the term "serious firearm offense."

A review of the arrest warrant affidavit in the present case[8] establishes that the defendant's discharge and use

---

[8] Contrary to the majority's suggestion, my review of the arrest warrant affidavit to determine whether the criminal act charged involved the accused

of a firearm is the central act that constitutes the actus reus of the charged offense at issue in this case and was the overt act in furtherance of the conspiracy.[9] Given that the legislature intended P.A. 23-53 to be a comprehensive response to gun violence in Connecticut, I conclude that the legislature would deem the act of firing a gun in broad daylight into a parked car in connection with a narcotics sale dispute to be the paradigmatic serious firearm offense within the meaning of §§ 53a-3 (24) and 54-64a (c) (2). Accordingly, I conclude that the trial court correctly exercised its authority to grant the state's petition for a 30 percent cash bond.

Because I would deny the relief requested, I respectfully dissent.

person's *discharging, using, or being armed with and threatening the use of a firearm* does not "[conflate] the separate requirements of a 'serious firearm offense' with whether the defendant is a serious safety risk." The majority posits that "§ 54-64a (c) contains no language permitting the state to present evidence to establish whether a defendant committed a 'serious firearm offense.' " Section 54-64a (c) (2) does not need to expressly authorize this inquiry or require the presentation of evidence on the point beyond consideration of the allegations in the arrest warrant affidavit that furnish the basis for the probable cause finding.

Determining the criminal conduct of which the defendant is accused lies at the core of the bond inquiry, as contemplated by the governing statutes and rules of practice. A brief review of the arrest warrant affidavit, which is part of the existing bond inquiry; see General Statutes § 54-64a (b) (2) and (c) (3); Practice Book § 38-4 (d); would readily disclose whether there is probable cause to believe that the defendant "discharged, used or was armed with and threatened the use of a firearm" in the commission of the charged offense. General Statutes § 53a-3 (24).

[9] Although much of the focus in this case concerns the language of the murder statute, I do not discount the defendant's claim that a conspiracy can never be a serious firearm offense. The defendant emphasizes that the "overt act in pursuance of such conspiracy" element of § 53a-48 (a) does not by itself require the use of a firearm and that "a conspiracy can occur without all of the 'essential elements' of the crime that is the subject of the conspiracy taking place." The arrest warrant affidavit indicates that the charges in the present case involve coconspirators who committed the overt act of discharging and using a firearm while participating in the commission of the agreed on murder. I, therefore, do not need to consider whether other overt acts might fall within the scope of §§ 53a-3 (24) and 54-64 (a) (2).